NOT DESIGNATED FOR PUBLICATION

No. 121,860

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of A.H.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; JANE A. WILSON, judge. Opinion filed March 13, 2020. Affirmed.

*Aline E. Pryor*, of Kansas City, for appellant natural father.

*Daniel G. Obermeier*, assistant district attorney, and *Mark A. Dupree Sr.*, district attorney, for appellee.

Before BUSER, P.J., STANDRIDGE and WARNER, JJ.

PER CURIAM: Father, the natural parent of A.H., appeals from the district court's decision to terminate his parental rights. He contends there was insufficient evidence to support termination, the court's decision was too heavily influenced by the fact of his incarceration, and that termination was not in the best interests of A.H. because the court refused to consider less drastic alternatives. After carefully reviewing the parties' arguments, we affirm.

FACTUAL AND PROCEDURAL HISTORY

On May 8, 2018, the State filed a petition alleging A.H.—along with his three half-siblings—was a child in need of care (CINC). The petition was based on facts and information gathered by the Kansas Department for Children and Families. The

1

Department received reports of concern about A.H.'s unborn half-sibling because of Mother's drug use: Mother admitted to using and/or tested positive for methamphetamine, PCP, MDMA, and amphetamines. The Department also received a report specifically about A.H., alleging Mother and her boyfriend were physically and emotionally abusive.

A.H. was eight years old when the Department filed its CINC petition. At that time, Father was incarcerated and was not involved in A.H.'s life. In fact, Father had not seen A.H. in more than six years. A.H. did not know Father was his biological father.

On May 11, 2018, the district court granted the Department emergency temporary custody of A.H. and his half-siblings. The court ordered the parents to obtain family- and mental-health assessments and to follow the Department's recommendations, obtain and maintain stable housing and income, contact the Case Services Officer (CSO) once a month, and participate in parent education. Although Father was incarcerated, he was sent written notification—a "petition packet"—with the journal entries. The packet also set forth the specific tasks Father needed to accomplish in order to move toward rehabilitation and reintegration with A.H. Father sent a return packet to the CSO less than two weeks later. On May 31, 2018, the district court adjudicated A.H. a CINC and confirmed its earlier orders regarding Father's reintegration requirements.

Father was released from prison on July 6, 2018. To comply with the court's orders, Father was required to find stable housing, stable income, participate in parenting classes, sign releases, submit UAs, maintain contact with the CSO, and comply with his postrelease conditions. But Father never contacted the CSO and did not complete any of the mandated tasks. Although Father later testified that he never received the journal entries the CSO was sending while he was out of prison, the CSO sent information about the case to the address Father provided. And seven months after being released from prison, Father was reincarcerated for violating the conditions of his release and violating a no-contact order.

The State moved to terminate Mother's and Father's parental rights. Mother stipulated to the termination of her rights, but Father contested the termination proceedings. The State alleged Father had failed to adjust his circumstances to meet the needs of A.H., failed to communicate with case workers, had completed none of the court's orders, had not visited A.H. during the case, and had been reincarcerated.

The district court held a hearing on the State's termination request, at which the CSO and Father testified. At the close of the hearing, the court terminated Father's parental rights, finding clear and convincing evidence established Father was unfit to parent A.H. and was unlikely to change his circumstances in the foreseeable future. The court also found termination was in the best interests of A.H. The court found Father had not adjusted his circumstances to meet the needs of A.H.; had not maintained regular visitation, contact, or communication with the child; and had not followed the court-approved integration plan. See K.S.A. 2019 Supp. 38-2269(b)(7), (b)(8), (c)(2), and (c)(3). The court also found Father had been convicted of a felony and was imprisoned. See K.S.A. 2019 Supp. 38-2269(b)(4), (b)(5). Father appeals.

DISCUSSION

A parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Before terminating a person's parental rights, a district court must find the State has proven the parent is unfit; the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future; and termination of parental rights is in the best interests of the child. K.S.A. 2019 Supp. 38-2269(a), (g). Due to the fundamental nature of the parental right, any findings relating to a parent's unfitness must be proved by clear and convincing evidence. K.S.A. 2019 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

When reviewing a finding of parental unfitness, this court must determine, after considering all the evidence in a light favoring the State, whether a rational fact-finder could have found that finding to be highly probable. *In re B.D.-Y.*, 286 Kan. at 705. We do not reweigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705.

After finding a parent unfit, the district court must determine if termination of parental rights is "in the best interests of the child." K.S.A. 2019 Supp. 38-2269(g)(1). This assessment gives "primary consideration to the physical, mental and emotional health of the child." K.S.A. 2019 Supp. 38-2269(g)(1). Because determining what is in a child's best interests is inherently a judgment call, we will only overturn a district court's best-interests determination when it constitutes an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2. A district court exceeds the broad latitude it is afforded if it rules in a way no reasonable person would have under the circumstances, ignores controlling facts or relies on unproven factual representations, or acts outside the appropriate legal framework. *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 60, 392 P.3d 68 (2017).

Father raises two arguments on appeal. *First*, Father asserts the district court erred in finding he was an unfit parent. He claims the court relied too heavily on his incarceration in assessing his fitness and questions the court's conclusions as to K.S.A. 2019 Supp. 38-2269(b)(7), (b)(8), and (c)(2) (which deal with his efforts to rehabilitate the family and change his life to better meet A.H.'s needs), arguing the various state agencies involved did not make sufficient efforts to help him reestablish a connection with A.H. while he was in prison. *Second*, Father claims the district court erred in its best-interests analysis because it did not consider less drastic alternatives to termination. We address each of these claims in turn.

1. *The State proved Father's unfitness by clear and convincing evidence.*

K.S.A. 2019 Supp. 38-2269 lists several nonexclusive factors a court considers—singularly or in combination—to determine whether a parent is unfit. The district court cited the following provisions in reaching its termination decision:

- K.S.A. 2019 Supp. 38-2269(b)(4) (physical, mental, or emotional neglect of A.H.);

- K.S.A. 2019 Supp. 38-2269(b)(5) (conviction of a felony and imprisonment);

- K.S.A. 2019 Supp. 38-2269(b)(7) (failure to rehabilitate the family);

- K.S.A. 2019 Supp. 38-2269(b)(8) (lack of effort to adjust to meet A.H.'s needs);

- K.S.A. 2019 Supp. 38-2269(c)(2) (failure to maintain visitation, communication, or contact with A.H.); and

- K.S.A. 2019 Supp. 38-2269(c)(3) (failure to carry out a reasonable plan).

In challenging the district court's finding of unfitness, Father focuses primarily on the court's reliance on K.S.A. 2019 Supp. 38-2269(b)(5), which lists a "conviction of a felony and imprisonment" as one of many nonexclusive factors to determine whether a person is a fit parent. There is no question that Father was incarcerated throughout much of this case. According to his own testimony, he was in and out of jail eight times since A.H. was born. When the case was filed, Father was incarcerated for a drug distribution conviction. He was then released midway through the case, but he violated the terms of his release and was reincarcerated months later.

Father does not challenge the district court's findings regarding his felony conviction or imprisonment. Instead, he challenges the weight the court gave that factor, arguing that his incarceration should have been considered a mitigating circumstance, as it was more difficult for him to communicate with the CSO, the Department, and A.H.

5

Father claims he did not receive all of the communications from the court or the CSO while he was in prison, so he did not know what he needed to do to reintegrate with A.H.

This argument is misplaced. Certainly, Kansas law recognizes that Father was limited in how he could interact with A.H. and make other progress toward reintegration while he was incarcerated. For this reason, when a parent is "incarcerated and unable to fulfill the customary parental duties" of someone not in prison, "the court must determine whether such parent has pursued the opportunities and options which may be available to carry out such duties to the best of his or her ability." *In re Adoption of F.A.R.*, 242 Kan. 231, 236, 747 P.2d 145 (1987). To this end, we routinely examine whether district courts have considered an incarcerated parent's pursuit of opportunities and options available while incarcerated. See *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009); *In re D.T.*, 30 Kan. App. 2d 1172, 1174-75, 56 P.3d 840 (2002); *In re K.W.*, No. 109,009, 2013 WL 5610259, at *3 (Kan. App. 2013) (unpublished opinion). Here, the district court appropriately did so. And more importantly, Father was out of prison for 7 of the 15 months A.H.'s CINC petition was pending and took no steps during that time to comply with the court's orders, contact A.H. or the CSO, or reintegrate with the child.

At the termination hearing, Father gave several reasons for why—when he would be released from prison this next time after being reincarcerated while the petition was pending—he would be able to parent A.H. He testified he had a job lined up for after his release, had completed GED and substance abuse classes, had undergone a religious conversion, and had almost completed an online parenting program.

But despite Father's professed willingness to work toward completing the court's orders at the termination hearing, the record demonstrates he took no steps whatsoever toward reintegration when he was released from prison while the CINC petition was pending. He did not contact the CSO; the only time Father communicated with the CSO during this case was when he was still incarcerated and returned his petition packet. He

6

did not communicate with A.H. Father's failure to communicate with the CSO or A.H., his relapse into drug use, and his violation of the conditions of his release and reincarceration belie his stated intentions and show that he failed to take advantage of any of the opportunities and options to reintegrate with A.H. that were presented to him.

In a similar vein, Father argues the district court erred in concluding his efforts to rehabilitate the family and reform his life to reintegrate with A.H. were inadequate. See K.S.A. 2019 Supp. 38-2269(b)(7), (b)(8), (c)(2). Father claims any fault for failure to comply with the court's orders belonged to the CSO and the Department, as they did not keep him informed as the case progressed. But the evidence in the record supports the district court's conclusion that despite Father's incarceration, the CSO mailed him—and he received—information about the case, including the reintegration tasks he had to complete. And despite receiving this information, he made no effort to communicate or cooperate with the CSO, the Department, or A.H., inside or outside of prison.

Father was notified of the CINC case concerning A.H. and informed of the required reintegration tasks. He replied to the initial petition packet while he was incarcerated yet ceased all communication and involvement once he was released, opting instead to relapse into drug use. The fact that Father was imprisoned for 8 of the 15 months the CINC case was pending does not change the fact that he failed to remain in contact and made no steps toward working on the reintegration plan, either inside or outside of prison. Nor does it obviate the fact that Father has no father-child connection with A.H. and took no steps toward establishing such a relationship. Aside from Father's self-serving claims that the CSO and the Department could have done more to accommodate his situation, there is no evidence they failed to inform him of the court's requirements or the potential training, counseling, and other rehabilitative and reintegration services available.

The district court's findings that Father was incarcerated for a felony and failed to make sufficient efforts to reintegrate with A.H. or reform his actions to allow him to take on the parental role—whether in or out of prison—are supported by evidence in the record. We do not reweigh the evidence but consider whether, based on the record as a whole, it is highly probable that Father was unfit. Having reviewed the record, we find sufficient evidence to support the court's conclusion, by clear and convincing evidence, that Father was not fit to parent A.H. and that this circumstance was unlikely to change in the foreseeable future.

2. *The district court's analysis of A.H.'s best interests is reasonable.*

Father also argues the district court erred in its analysis of A.H.'s best interests when it ultimately decided to terminate Father's parental rights. He asserts that because making parenting decisions for one's child is a fundamental right, the court should have considered less drastic alternatives to termination, particularly since he testified that he had reformed his life in numerous ways, would be released from prison in four months, and had a job lined up after his release. Father also argues that his lack of contact with A.H. to this point was due primarily to the efforts by A.H.'s birth mother to limit communications with the child.

A district court's analysis of the best interests of the child is governed by K.S.A. 2019 Supp. 38-2269(g)(1). Under that statute, after a court has made a finding that a parent is unfit, "the court shall consider whether termination of parental rights . . . is in the best interests of the child." K.S.A. 2019 Supp. 38-2269(g)(1). The statute further instructs the court to "give primary consideration to the physical, mental and emotional health of the child"—directing that "[i]f the physical, mental or emotional needs of the child would best be served by termination of parental rights, *the court shall so order*." (Emphasis added.) K.S.A. 2019 Supp. 38-2269(g)(1).

Thus, contrary to Father's arguments, K.S.A. 2019 Supp. 38-2269 did not require the district court to impose less drastic measures than termination. Rather, K.S.A. 2019 Supp. 38-2269(g)(1) directs that termination *shall be ordered* when the district court finds it is in the child's best interests.

Our review of the record demonstrates the district court considered the factual allegations and arguments presented and ultimately concluded it was in A.H.'s best interests to terminate Father's parental rights. The record indicates that this conclusion was reasonable in light of the record and within the court's sound discretion. There was no evidence presented of any familial bond between Father and A.H. A.H. was 18 months old when he last saw Father; at the time of trial, A.H. was 9 years old. Father had no relationship with A.H. throughout the vast majority of A.H.'s life and had been incarcerated much of that time, showing a tendency to relapse into drug use. While Father was out of prison, he made no progress toward rehabilitating himself or establishing a paternal relationship with A.H. Because Mother stipulated to the termination of her parental rights, Father would have been required to become A.H.'s primary caregiver upon his release, even though he has never been a primary caregiver before and had no paternal relationship with the child.

Because the district court is present to hear testimony and review firsthand the evidence, that court is in "the best position to make findings on the best interests of the child." *In re K.P.*, 44 Kan. App. 2d 316, 318, 235 P.3d 1255 (2010). We therefore defer to the district court's discretionary judgment and will not reverse a best-interests determination "in the absence of an abuse of judicial discretion." 44 Kan. App. 2d at 318. The district court did not abuse its discretion when it determined that termination was in the best interests of A.H., based on the child's physical, mental, and emotional health and needs.

Affirmed.